PAUL J. YOUNG (Utah Bar 4701)
489 South 1650 East
Springville, UT  84663
Cell (801) 319-4781
Res (801) 491-8575
Attorney for Plaintiff
Thetruthtoday@yahoo.com

FILED
CLERK, U S DISTRICT COURT

2004 NOV 15  P 1: 10

BY:
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ANASAZI CUTURAL RESEARCH FOUNDATION, ASA NIELSON, LUGENE BLACK, VISUAL ARTS INSTITUTE, RUSS MAUGHAN, ROSS CHEESMAN, NATALIA NIKIFOROVA, MICHAEL L. PUTNAM, MARK SWAN, LENNA RODGERS, JON BAXTER, CLAY CUMMINGS, DEBRA HILL, ALAN KNIGHT, HYRUM SMITH, PAM WITT, FRED HILLSMAN, GLADE HALL, DALE AND DEBBIE GOURLEY, JAY CHEESMAN, DON TISH PARKER, DENNIS HARWARD, CURTIS BLACK, CHAD WOOD, BRET PERKINS, ROY AND ANN BRINKERHOFF, CAROL C. GAY, RANDY GLEGG, MARLENE CUMMINGS, TIM PUTNAM, KURT AND LORI HOFFMAN, JAMES AND CYNDI HARDMAN, VICTOR PRESTON, with 58 OTHER INVESTORS LISTED HEREUNDER and Does 1-120. ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | COMPLAINT<br><br>BREACH OF CONTRACT, FRAUD, THEFT BY DECEPTION, PONZI SCHEME |
| Plaintiffs, ) ) ) ) | |
| vs. ) ) ) ) | |
| THOMAS ROBBINS, MARY ROBBINS, RICHARD C. BYBEE, CLAIR W. COX, ROGER COX, DOUG LISTER, QUADE NELSON, RANDY HAMEL, WOLFGANG BENNECKENSTIEN, TEK CORP. a Utah Corporation, TEK FOUNDATION, a Utah ) ) ) ) ) ) ) | Judge David Sam<br>DECK TYPE: Civil<br>DATE STAMP: 11/15/2004 @ 13:10:12<br>CASE NUMBER: 2:04CV01055 DS |

1

| | |
|---|---|
| Non-profit Corporation, VENTURE TEK, | ) |
| LAND DEVELOPMENT CORPORATION | ) |
| UTEK AG (Liechtenstein), SMG HOLDINGS | ) |
| AG, (Liechtenstein), TEK EURO HOLDINGS | ) |
| (Ireland), TEK UNITED HOLDINGS Ltd | ) |
| (Australia), TEK CORP Ltd (Guernsey), | ) |
| UNIVERSAL ROCKWELL CORPORATION, | ) |
| I-TRUST and Does 1-100, | ) |
| Defendants. | ) |

MAY IT PLEASE THE COURT RESPECTFULLY, the plaintiffs, who number

over 100, are a group of investors comprised of persons, trusts, and business entities who

for the most part are domiciled in Utah, with others from several other states so indicated

below, who were induced through falsehoods and deception to invest in a scheme

conceived and operated by the defendants, that has caused funds to be transported to

other states and to several foreign countries through a conduit beginning at their Utah

headquarters, resulting in the wrongful taking of the plaintiffs money.  The plaintiffs so

make this complaint and allege as follows:

### INTRODUCTION

1.      The schemes by the defendants included the taking of money from the

plaintiffs under a contract that promised a "guaranteed minimum" return to each of the

plaintiffs of "100% per month for one year with the option to renew".  Most of the

contracts were signed approximately between August and November of the year 2002.

The contracts were uniform containing virtually the same terms for each.  The promised

payment at the anniversary date of the completion of each contract has passed.  A second

year beyond that date has also now passed for most of the investors.  No options were

given or requested.  The funds are not accounted for and there is strong reason to believe

that they have been stolen.  Plaintiffs have cooperated with federal and state authorities in

2

the investigation of the fraud of the Defendants and have determined to protect their interests and seek appropriate redress after repeated demands have been made for a return of the invested funds and/or the promised profits under the contract that legal action is necessary.

2.      Written demands for the return of the money made pursuant to rights originally granted under the contract have been denied.  Instead such demands have been met with a series of e-mails in response that have made promise after promise of payment and an honorable completion of the contract, but without any fulfillment.  In fact none of the promises have been kept and no payouts have been made in compliance with any of the original guarantees. The delays served only to prolong the period of time in which the defendants had to further dissipate and hide the assets of the plaintiffs.  It is now clear that the intent of the defendants was to separate the plaintiffs from their assets from the beginning and to do so without any real expectation of fulfilling on the contracts.

3.      The funds were transferred through various conduits which were established by the defendants, one known as the "I Trust" which is a checking account at Wells Fargo Bank account No. 4861-505626, for the purpose of illegally depriving them of their invested money.   The main entity to which the money was transferred was TEK Corporation, a Utah for Profit Corporation that maintained a web site which it shared with an entity known as TEK Foundation, a now defaulted Utah Non-Profit entity, found at tekfoundation.org .

4.      What makes this particularly offensive is the defendants used their position as members of the Church of Jesus Christ of Latter Day Saints to influence and gain the confidence of the Plaintiffs to get them to give over their money.  Plaintiffs were

3

lied to through a series of letters, e-mails, phone calls, and written contracts designed to delay recovery and facilitate the fraudulent taking in a theft by deception.

5.    At one point early in the scheme some of the plaintiffs were even "paid back" some of the money in a token payment that they disguised as proceeds from some imaginary profitable off shore investment transaction, which they pretended to be successful. It is now believed such payments were nothing more than a pay back of the investors own money, or that of some money collected from yet others drawn into the scheme, in a Ponzi type payout to induce a false sense of security about the validity of the scheme so that still others would believe it was safe to invest. Never was an investor paid more than they had actually invested and usually far less than their actual investment. After spreading the word amongst relatives and friends they were then induced to "reinvest" the same money and even add to it. In some circumstances this included the life savings and retirement accounts of some who were elderly.

6.    They would, in furtherance of their conspiracy, convince the investors to make good faith recommendations about the program to their friends and relatives with particular emphasis on members of the LDS Church.   In reality the defendants were only paying themselves and using the money to finance their own investment experiments.

7.    In the months after the program began and the first adulterated so-called "profits" were paid in amount far less than had been invested, no additional funds were received by the plaintiffs and a series of diversionary tactics were employed to do nothing more than stall for time rather than fulfilling on contractual obligations. The investors were promised fantastic returns on their invested funds in the typical confidence scam.  In

this case the promised returns over the year would have amounted to a sum in excess of $300,000,000 (Three hundred million dollars) at a minimum. This complaint is filed on behalf of the investors in an attempt to recover whatever assets might be remaining that are rightfully attributable to their investment and before such assets are completely dissipated by the defendants.

8.    It is believed that the authority of this court will be necessary to assist in the recovery of the money, as this is a situation where such assets are in jeopardy. The plaintiffs have been cooperating with federal and state authorities in this matter and pursuant to developments related to that cooperation respectfully present this complaint.

## JURISDICTION AND VENUE

9.    This Court has original jurisdiction over this action pursuant to 28 USCS § 1332 inasmuch as the case in controversy exceeds the sum of $10,000, exclusive of interests and costs, and is between citizens of different states.

10.    There is diversity of citizenship, 28 USCS § 1332, FRCP 8(a)(1) as the Plaintiffs are domiciled in the States of Utah, Oregon, California, Missouri, Washington, Arizona, Montana, and the country of Costa Rica. The defendants have had their principle place of business during all time material to this action in Salt Lake County, Utah and are domiciled in Utah, Idaho, and Germany, as well as other parts of Europe. The defendants TEK Corporation, Venture TEK, Land Development Corporation, and Universal Rockwell Corporation are Utah for profit corporations that have at all times mentioned hereafter been engaged in transactions and business in the State of Utah. Each

5

of these entities has, or did have, possession of assets or funds directly related to the money in controversy. TEK Foundation is a non-profit entity organized by the defendants that has its principal place of business in Salt Lake County, Utah. UTEK AG and SMG Holdings AG are corporations organized and registered in the country of Liechtenstein and were established by the defendants for doing business off shore in transaction involving the assets of the plaintiffs. TEK Euro Holdings is a corporation established in the country of Ireland and is linked to the other defendants in the transfer and spending of the money of the plaintiffs. TEK United Holdings is a corporation established in the country of Australia and is linked to the other defendants in the transfer and spending of the money of the plaintiffs. It is thought to be a place used to secret funds away in furtherance of the scheme. TEK Corp. Ltd is a corporation established in the country of Guernsey and is linked to the other defendants in the transfer and spending of the money of the plaintiffs. The I-Trust was not a trust at all. It is a checking account at Wells Fargo Bank in the State of Utah.

11.    This is an action of a civil nature involving case involving, exclusive of interest and costs, a sum in excess of $10,000. 28 USCS § 1332 . The amount of invested funds is in excess of two million five hundred thousand dollars ($2,500,000) plus contracted earnings of over three hundred million dollars ($300,000,000). The contract of each party was virtually identical in terms, verbiage, conditions, restrictions and guarantees. Every issue of law and fact in the action is wholly between the plaintiffs and the defendants.

6

12.    The defendants, directly or indirectly, have made use of the mails, means or instruments of transportation or communication in interstate commerce, or means or instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business described in this Complaint.

13.    Venue over this action is proper pursuant to FRCP 12(h), 7(b), 8(b), 8(3), and 12, in addition to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa]. Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)] and Sections 21(d)(3), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(e) and 78aa]. Inasmuch as there are funds at risk and the likelihood of recovery depends directly on the actions of this court, jurisdiction is sought under 28 USC § 1335 for immediate interpleaded of funds and assets in jeopardy.

14.    Certain of the transactions, acts, practices and courses of business constituting violations alleged herein occurred within the state of Utah. TEK'S headquarters is or was located in Draper, Utah. All of the defendants engaged and transacted business within the state of Utah during the time the financial statements were prepared and filed with the Commission. Moreover, all the defendants with the exception of the European entities, and the individual named Wolfgang Benneckenstein, reside or may be found within the District of Utah.

## PARTIES

15.     In an effort to bring some sense of uniformity to what could easily be considered a complex case, plaintiffs seek to simplify this matter for the sake of bringing this case to a just close and to make a reasonable effort to recover what is rightfully theirs.  For that reason the Defendants are presented first followed by the Plaintiffs.

## THE DEFENDANTS:

16.     **Thomas Robbins** (hereinafter "Robbins") is a resident of Milford, Utah, although much of his time is spent overseas in several countries including England, Ireland, Germany, Spain, Liechtenstein, Australia, Israel, Guernsey, Luxembourg, Switzerland, and others.  He is one of the founding members of TEK Corp., TEK Foundation, Venture TEK, UTEK AG (Liechtenstein), TEK Euro Holdings Ltd. (Ireland), TEK United Holdings Ltd. (Australia), TEK Corp Ltd. (Guernsey), Land Development Corporation, Bonam Holdings International Inc., SMG Holdings AG (Liechtenstein), and other entities.  He claims to have extensive experience in the "private investment arena" and also claims to be a Private Trader.  He claims to have the ability to invest with a private trading facility, and is capable, he claims, of investing "any degree of funds in various market vehicles, including "Investment Trade Transactions"".  Robbins claims to have a Ph.D. from Columbus University in Administrative Management, and Economics (an internet diploma); a M.B.A. from Golden State University in San Francisco in Business Administration (also an internet diploma); a B.S. from Brigham Young University in Finance and Economics, and an Associates Degree

from Ricks College, Rexburg, Idaho in Accounting. His published resume shows him to have been a college Professor and taught up to master level graduate students. He claims to have many awards for teaching and for his outstanding performance in economics and finance. Truth is he worked at a small rural bank as an officer and learned the lingo. He claims to have been invited in 1999 to the World economic Summit in Lausanne Switzerland. He organized TEK Corp in November 15, 1999 in the state of Utah (see below). Robbins through others entered into contracts with each of the investors, sent them updates by phone and via e-mail, and paid funds to investors. He is the most active member of the defendants and bears the greatest responsibility. He is on each of the contracts with each of the plaintiffs as the contracting party for TEK. He is responsible for the location, investment, spending, and transfer of the money of the investors. He has the authority to return the funds. He is also the one who directed the use of plaintiffs' funds for various purposes not contemplated by the contracts. Federal authorities have also informed counsel that Robbins has a prior criminal record and has been convicted of felonies in other jurisdictions, which has included a period of incarceration for fraud.

17.    **Mary Robbins** (hereinafter "Mary") is the wife of Robbins who is a resident of Milford, Utah. She is not Robbins first wife and they have been married since _____. She has her own children from a prior marriage, as does Robbins whose son lives with Mary while his father is away in Europe. A great deal of money, and assets, has passed through Mary directly from the invested funds. It is believed that Mary has not been involved with any criminal intent but that she has been used to a great extent by Robbins to transfer assets, property, and information. As such with her name being attached to some of the assets and her other involvement her being named, as a defendant

9

has become a necessary act to preserve causes of action and to secure judgments in the recovery of losses against assets that have been purchased with plaintiffs' funds.

18.    **Richard C. Bybee** (hereinafter "Bybee") is a resident of Utah living in Salt Lake County. He is a founder and COO, Vice President of TEK Corp, TEK Foundation, Venture TEK, Land Development Corporation, and is CEO of two other corporations said not to be related to TEK Corp. His role was claimed to be that of overseeing the overall operations, planning and corporate direction in the Company, as well as the development of company vision, mission, and strategic planning of internal systems and controls. Bybee's published claim to fame is that he has an extensive background in business, marketing, and negotiations even to the point of having a "unique approach to business and leadership". He claims to have owned and operated other businesses including "High Impact Activewear" a clothing company that is not listed with the Utah Department of Commerce. It is interesting that in the published promotional materials it states "Mr. Bybee possesses a distinctive ability to identify opportunities, and then capitalize on those opportunities". The investors do not doubt this and now hold him responsible for the taking of their assets.

19.    **Clair W. Cox** (hereinafter "Cox") is a resident of Utah believed to live in Salt Lake County. He is the Chief Financial Officer (CFO), Secretary, Treasurer and Corporate Counsel for TEK Corp., TEK Foundation, Venture TEK, Land Development Corporation and claims to be CEO of other corporation not related to TEK. The published promotional materials (see Exhibit ___) describe his primary role in the Company as "strategic planning, corporate direction and corporate overseer". He has a Doctor of Jurisprudence from John Marshall School of Atlanta Georgia but does not

appear to have a license to practice law in the state of Utah according the Utah State Bar.

He does have an active law license from the state of Georgia. His published information

indicates that he was the president of a building and development company for over 17

years building "over 100 homes and commercial buildings and also developing

subdivisions of residential housing". It also claims that he has extensive background and

experience in setting up Corporations and Limited Liability Companies "for

entrepreneurs and created documentation for these startup companies to get a positive

start and helped assist in creating long term profitable business." Among his listed

experiences are his relationships with various banks conducting financial arrangements

with regards to "various transactions". It also claims that he "assisted in whatever way

possible to consummate the contractual obligation of the parties". Cox was very involved

with the creation of all of the contracts used by Robbins in the carrying out of the

scheme. He supervised the execution of the agreements and reviewed each document as

it was signed. He wrote the language of the documents and it is believed that he was the

one would set up the companies in the first place for Robbins.

20.     **Roger W. Cox** (hereinafter "Dr. Cox") is also a resident of Salt Lake

County, Utah. Dr. Cox is the President of TEK Foundation. Dr. Cox has an impressive

resume. He has been a professional educator for 40 years. He is the Assistant

Superintendent of Weber County School District in Ogden, Utah. He has a Ph.D. from

University of Utah, Salt Lake City, Utah in Health, Physical Education and

Administration. He has a Master Degree in Recreation Education from Brigham Young

University, a Bachelor's Degree from Utah State University in Psychology and Physical

Education. and an Associates Degree in Business from Weber State University.

21. **Doug Lister** (hereinafter "Lister") is a Director of the TEK Foundation and has become the most frequented contact between Robbins and the plaintiffs. He has received hundreds of messages from Robbins and passed them along with his own commentary. He has published that is involved with "the day-to-day operations, and development of a perpetuating fund to support the operating costs for the educational resource centers of the foundation". There has been no evidence produced that even one center is open much less operational. He was presented as someone who had worked in a position of leadership in Transamerica Financial, as a regional manager of mining, industrial, and municipal sales for Westinghouse Electric Supply Co., A Western States Division mining specialist for Anixter Bros., and a Western States Division Manager for National Mine Service Co. His published resume credited him for being an expert in using a "hands on" approach to management. Equally published were his activities in the community and church showing him to be a very active member of the LDS Church, contributing many hours to serving the community and the youth. It was through his contacts and reputation as an active Church member that he was able to gain the trust of so many of the investors.

22. **Quade Nelson** (hereinafter "Nelson") – was Vice President of TEK Foundation and a resident of Utah. In his published resume it states that he was "very instrumental in the organization process of TEK Foundation". It was also published that he had "over 20 years experience in the expansion, development, and management of business." This experience it explains includes being involved from the planning stage to "successful conclusions". Nelson is a participant in the overall program of TEK.

23. **Randy Hamel** (hereinafter "Hamel") – is Vice President of Investment in

TEK Corp, and Property Management for TEK. His responsibilities were over property management and investment. He is key to discovery of the actual flow of assets through TEK and its various entities. His published biography shows that he had "over 23 years experience in the development and management of both residential and commercial real estate". His charge was to "seek out commercial office buildings capable of providing a positive cash flow and significant appreciation potential" and to find other "strategic pieces of real estate that support TEK's overall management plan". Hamel is sought after for his decisions made to use the plaintiffs' funds and to identify which properties were purchased with plaintiffs' money.

24. **Wolfgang Benneckenstein** (hereinafter "Wolfgang") is on the Board of Directors of TEK Foundation. Wolfgang is believed to be a German citizen who resides in that country. He is the contact through which Robbins established his scenario for an investment program. He is the Director and Principal of UTEK Corporation AG that is suspected of being one of the conduits used to take the plaintiffs' funds offshore. His published resume shows that he is the owner and manager of restaurants and hotels in Northern Germany and Spain. He claims as well to be an officer in several other Germany and European Corporations. He is supposed to have provided business plans, marketing, investment analysis, and advisor capacity skills. His involvement was critical in moving the funds offshore. He has been the subject of many e-mails and communications to further the scheme and has done all that he can to cover up the realities of what has actually happened to the funds.

25. **TEK Corp** (hereinafter "TEK") – a domestic for profit Utah Corporation first

registered as a legal entity with the State of Utah (Entity Number 1469482-0142) on November 15, 1999. According to the published records of the Utah Department of Commerce the current address for TEK is 682 E Vine Street, Suite 4, Murray, UT 84107. The current registered agent listed is Clair Cox whose address is the same as above. TEK Corp is significant to this action as it is the main vehicle through which the contracts were constructed. It is that body which controlled the bank accounts and trusts into which the funds were deposited and from which they were later disbursed. It is also the main entity through which Robbins entered into contracts and conducted his business with each of the investors. It currently remains in good standing.

26.    **TEK Foundation** – a Utah Domestic Non-Profit Corporation (Entity No. 4888725-0140) originally registered on March 21, 2001, with Clair Cox as the Registered Agent, and has since become delinquent on March 22, 2004 for failure to file and pay for renewal. TEK Foundation became the centerpiece of activity as a device to convince investors of the philanthropic goals it was suppose incorporate in its investment objectives. CEO is Robbins; Vice President and Chief Operating Officer is Richard Bybee; Chief Financial Officer, Secretary, and Treasurer, is Clair Cox; President, Roger Cox; Director, Doug Lister; Vice President, Quade Nelson; Vice President of Investment and Property Management, Randt Hamel; and Director, Wolfgang Benneckenstein. All of the above officers are alleged to have cooperated in concert to obtain by fraud and trick the funds of the defendants through the ruse of the TEK Foundation that was held out in the public and on the Internet to be an organization that had as its purpose charitable work throughout the world. Its principal focus was to establish schools for under privileged children through moneys earned as a byproduct of the investments made by

TEK investors. The story was TEK investors, the plaintiffs, would cause the funds to be generated as a direct by-product of their own investments through TEK Corp. Investors became members in TEK Foundation and could boast of the good works they were doing through the world. TEK Corp is listed as a major shareholder of TEK Foundation.

27. **Venture TEK** (hereinafter "Venture") is an entity established for the sole purpose of assisting Robbins and others in holding and distributing cash. TEK Corp is the majority and controlling shareholder. Its purpose is published as "a Private Collateral and Asset Depositor and Guarantor" of TEK Corp. Venture also was suppose to arrange for bond issues, arrange optional reinsurance and structured notes. It is unclear whether such purposes were accomplished or even within the legal right of Venture to accomplish.

28. **Land Development Corporation** (hereinafter "LDC") is a domestic for Profit Utah Corporation registered on December 29, 2000. It is currently listed by the Utah Department of Commerce as "expired" for the reason that a renewal was not filed. Such a status began on March 24, 2004 after a renewal was not filed December 29, 2003. It is believed that LDC has received or controlled lands that can be directly attributable to the funds supplied to TEK by the plaintiffs. It is alleged that LDC is an entity controlled by TEK through Robbins and those which assets were placed with real property.

29. **UTEK AG** (hereinafter "UTEK") is a foreign corporation established in the Principality of Liechtenstein and has been identified as a financial advisor of TEK which is a shareholder of UTEK. It is a necessary party to the transactions through Europe and in tracing the location of assets and the flow of funds of the plaintiffs.

30. **TEK Euro Holdings** (hereinafter "TEK Euro") is a foreign corporation

established by Robbins in Ireland. Its purpose is not yet entirely understood except for the fact that it is controlled by Robbins and is believed to be one of the conduits through which the plaintiffs' funds were moved through or in which they may continue to exist on deposit or in the form of other assets. TEK Euro is published as being held by its majority stockholder, TEK Corp, which is also on the Board of Directors.

**31. TEK United Holdings, Ltd** (hereinafter "TEK United") is a foreign Corporation established by Robbins in Australia. Its purpose is not yet entirely understood except for the fact that it is controlled by Robbins and is believed to be one of the conduits through which the plaintiffs' funds were moved through or in which they may continue to exist on deposit or in the form of other assets. TEK United is also published as being held by its majority stockholder, TEK Corp, which is also on the Board of Directors.

**32. TEK Corp Ltd** (hereinafter "TEK Guernsey") is a foreign corporation established by Robbins in Guernsey. Its purpose is not yet entirely understood except for the fact that it is controlled by Robbins and is believed to be one of the conduits through which the plaintiffs' funds were moved through or in which they may continue to exist on deposit or in the form of other assets. TEK Guernsey is also published as being held by its majority stockholder, TEK Corp, which is also on the Board of Directors.

**33. Universal Rockwell Corporation** (hereinafter "Rockwell") is a domestic Corporation established by Robbins in Utah. Its purpose is not yet entirely understood except for the fact that it is controlled by Robbins and is believed to be one of the conduits through which the plaintiffs' funds were moved through or in which they may continue to exist on deposit or in the form of other assets. TEK Guernsey is also

published as being held by its majority stockholder, TEK Corp, which is also on the Board of Directors.

**34. The I Trust** (hereinafter "I-Trust") is a checking account established at Wells Fargo Bank (Account No. 0343377966) by Robbins and other defendants into which most all of the money for TEK was deposited on behalf of the investors. It is alleged that this account was the conduit for acquiring and stealing the assets of the investors who were told it would hold the funds as investment collateral. It does not appear to have ever actually been a formal trust but merely a checking account to facilitate the movement of funds between the various TEK entities.


THE PLAINTIFFS:

The Plaintiffs (which have been thus far identified) have been arranged in geographic order with an indication as to the amount of funds invested. Each Plaintiff is an individual residing in the area identified, except for a few that are designated as entities. All plaintiffs were under the same contractual relationship with TEK, and subject to the same set of damages and violations, adjusted for their several amounts only, and are named as follows:


**In the State of Utah**

    **35.** Orem, Utah
        a.  ANASAZI CUTURAL RESEARCH FOUNDATION, a Utah Non-profit Corporation, Orem, Utah $66,600;
        b.  ASA NIELSON Orem, Utah $3,000;
        c.  ROSS CHEESMAN Orem, Utah $8,410,
        d.  ALAN KNIGHT Orem $10,000 Big Picture, a Utah Corporation = $5,000,
        e.  ROY AND ANN BRINKERHOFF Orem, Utah $40,500,
        f.  MILLIE CHEESMAN TRUST Orem, Utah $8,000,

g. ARDY AND ARLAN GREENING Orem, Utah $21,000
h. JAY CHEESMAN Orem, Utah $37,500
i. RANDY GLEGG Orem, Utah
j. JAMES NIELSON Orem, Utah $1,700
k. NIELSON FAMILY TRUST Orem, Utah $37,500
l. TODD SEACAT Orem, Utah $9,000
m. JOHN AND TAMRA BABBITT Orem $10,000
n. QUINT AND ARLENE COLMAN Orem
o. BILL AND NECIA WITT Orem $25,000 + $9,000
p. LINDA ATOR Orem $1,000
q. RANDY AND SHANE CLEGG, CLEGG MANAGEMENT LLC $4,000
r. BASELINE, a Utah Corporation $3,000 Orem
s. BRUCE ROBERTSON $3,500

**36.** Provo, Utah
a. NATALIA NIKIFOROVA Provo $5,000  (– $3,000)
b. LENNA RODGERS Provo
c. CHAD WOOD Provo
d. LARRY FERGUSON Provo $900.00
e. DAVID WANNAMAKER Provo $5,000

**37.** St. George, Utah
a. MICHAEL L. PUTNAM St George
b. MARK SWAN St George  $52,000
c. FRED HILLSMAN St George
d. CRAIG LEBARON St George $150,000
e. DEBRA HILL St. George
f. HYRUM SMITH St George
g. DALE AND DEBBIE GOURLEY St George $3,500
h. ALENA SMITH St. George $9,000
i. GLENN GUNTER – St George $168,000
j. MICHAEL WATT PUTNAM TRUST St George $10,000

**38.** Salt Lake City, Utah
a. VISUAL ARTS INSTITUTE SLC $107,800
b. GLADE HALL SLC $152,000 WORK MANAGEMENT INC
c. DENNIS HARWARD/ GLOBAL ADVISORS SLC $25,500

**39.** Hurricane, Utah
a. BONNIE AND CLARK CAMPBELL Hurricane $20,000
b. MATTHEW HILL $3,000
c. TINA LUNDEEN Hurricane $10,000
d. SHIRLYN JOCELYN Hurricane $5,000
e. BRIAN CHANDLER Hurricane $5,000

**40.** Fillmore, Utah
- a. CLAY CUMMINGS Fillmore
- b. JOLYNN STEVENS Fillmore $50,000
- c. ILENE COOPER (deceased - estate) Fillmore $160,000
- d. ILENE B. COOPER TRUST –Fillmore $112,500
- e. DIANE HILL Sandy $5,000
- f. KENNETH AND ANNETTE DAY Fillmore $5,000
- g. DANIEL DAVIES/ WESTERN LEGACY RANCHES Fillmore
- h. TAMERA LANE Fillmore $77,000
- i. JOHN AND JANET COOPER Fillmore
- j. SEAN MANGOLD Fillmore  $5,000

**41.** American Fork, Utah
- a. JONATHAN BAXTER Am Fork $1,500
- b. JAMES ALLISON America Fork $2,000

**42.** Spanish Fork, Utah
- a. TY TINGEY Spanish Fork 100% $130,000
- b. LORI HANSEN  $5,000 Spanish Fork
- c. LES BLACKBURN Spanish Fork, Utah $70,000

**43.** Park City, Utah
- a. BRET PERKINS Park City  $15,000

**44.** Sandy, Utah
- a. THOMAS C. STEPHENSON Sandy $5,000
- b. JOLENE STEPHENSON Sandy $5,000

**45.** Springville, Utah
- a. JAMES AND CYNDI HARDMAN Springville

**46.** Mona, Utah
- a. RONALD AND LORI VEATER Mona, Utah  $15,000

**47.** Other Cities in Utah
- a. CURTIS BLACK Layton
- b. RUSS MAUGHAN  (Dan Davis)
- c. DON and TISH PARKER (Dan Davis)
- d. CAROLEE C. GAY Milford, Utah $5,000
- e. MARLENE CUMMINGS
- f. KURT AND LORI HOFFMAN Lehi, Utah  $4,000
- g. DOYLE AND PEARL TOPHAM Delta $10,000
- h. DARIN CUMMINGS Ephraim
- i. LINDA EMERY (?) $5,000
- j. RANDY ZMERZLIKAR $30,000

k.  INLAND GEO (see Chad Wood) $10,000
l.  PARADISE CANYON (see Craig LeBaron) $150,000
m. QUINT AND ARLENE COLEMAN $6,500
n.  NATALIYA FERGUSON $2,000
o.  ARDITH A. GREENING  $21,000
p.  FRANCIS AND LEENA ROGERS $12,500
q.  MILLIE F CHEESMAN $30,000
r.  HELP A CHILD FOUNDATION, a Utah charitable corporation (total above $267,450)
s.  MILLENNIAL TRUST $20,955
t.  DONNA NASH $2,500
u.  BOBBY ROBERTSON $2,200
v.  KENT MCDONALD $10,000 + $80,000
w.  CHAD ROBINSON Highland $20,000 (-16,800) $120,000
x.  BARBARA KIDD $5,000

**In the State of Oregon**

48.  Oregon
    a.  LUGENE BLACK Portland, Oregon

**In the State of Arizona**

49.  Arizona
    a.  DANIEL CUMMINGS Arizona
    b.  CHERLYN BREWER Arizona  $45,000

**In the State of California**

50.  California
    a.  PAMELA WITT Mission Viejo $25,000
    b.  JOHN LOVELL California

**In the State of Washington**

51.  Washington
    a.  JOHN CUMMINGS Washington

**In the State of Colorado**

52.  Colorado
    a.  GENE BLACKBURN Grand Junction CO  $20,000 ($16,000) $100,000

**In the State of Missouri**

53. Missouri
    a. TIMOTHY PUTNAM, Bridgeton, Missouri $50,000

**In the State of Nevada**

54. Nevada
    a. RUSSELL PHILLIPS Elko, NV $50,000

**In the State of New Mexico**

55. New Mexico
    a. CHRISTIAN AND HOLLY WITT Albuquerque, NM $76,000

**In the Country of Costa Rica**

56. Costa Rica
    a. VICTOR PRESTON San Jose CR $15,000

## STATEMENT OF THE FACTS

57. In and or about the year 2002, principally the months of October through December, TEK Corp, on the authority of Thomas Robbins as CEO, entered into contracts with most all of the plaintiffs. Thomas Robbins, also known as "Dr. Robbins" obtained his doctorate from Columbus University (www.columbususu.com) that also boasts of degrees in "Hypnotherapy. Metaphysics, Ministry, Film and Video, Creative Writing and Theocentric Counseling". His doctorate is also known as a "distance learning degree" or translated into common English "an internet diploma". One that could be suitably printed from your laser printer and carefully mounted where its apparent potential can be exploited. He obtained his MBA from Golden State University, a slightly more prestigious school because around the San Francisco area they appear to actually have some classrooms, but once again the Internet is the main access for degrees.

58. Robbins had come from a background of working for a small bank. He had learned how to arrange financing in the local area and helped in getting financial arrangements for some of his associates and actually did some banking. His experience was just enough to begin the use of the language of banking and give at least the appearance, in the spirit of the popular Tom Hanks movie "Catch Me if You Can", that he knew what he was doing. There was and is a continuing criminal intent by Robbins, who has kept his secret history of past criminal fraud convictions and prison time from the investors, buried under a carefully crafted resume, and a convincing smile used to off balance his trusting mostly LDS population of victims. He in fact has the ability to sell a convincing financial program, even though bogus, to an unsuspecting audience with the fervor of a religious preacher.

59. His first victims came from smaller rural towns in Southern Utah. He quickly branched out to the more populated areas of Northern Utah after he "primed the pump" by making some so-called payouts of "proceeds" he claimed had been earned by the invested funds in the programs. He also told investors that they did not need to worry about the safety of their assets because as promised they would never leave the United States and would remain in the account as leveraged assets used in the Program. He said they never needed to be withdrawn. He promised they were safe and could be returned. He violated that promise almost from the beginning.   There were many others.

60.  For an investment in cash each plaintiff was made the same promise under written contract of a return on their investment equal to 100% per month for a year. The document was titled "PRIVATE TRANSACTION JOINT AGREEMENT BETWEEN

TEK CORP AND (inserted was the name of each of the plaintiffs)" (hereinafter "TEK Contract").

61.  The purpose of the agreement was stated on its face as a "Private Transaction Purchase/Resell Trust Agreement" which was represented to each plaintiff as being administered by "the trust department of a licensed banking institution to purchase/resell investment grade instruments." It was made clear from the beginning that the bank itself was not the owner of the instruments.

62.    The instruments were alleged to be held in a trust account and controlled by a trust agreement with third party signatories.  The contract provided for the forming of a Joint Venture relationship for the purpose of entering into a "Private Transaction". By the terms of the Agreement the investor agreed to turn over certain cash assets to a person identified as the Asset Manager.  Under the Agreement the Asset Manager was given power over the cash to make certain investments under conditions, which both parties agreed to that including  (a) the investor would provide the cash, (b) the investor warranted that the cash funds were of non-criminal origin and free from all liens and encumbrances, and (c) the investor warrants that he is the bank recognized owner of the cash funds and that he possesses control and authority concerning the cash funds.

63.    In exchange TEK through the Asset Manager agreed to place the "Cash Funds" into a Private Transaction for the duration of one year and one month.  To accomplish this the Asset Manager would open a "Bank Trust Account" in the "Trust Department of the Trading Bank". Despite numerous requests and demands no evidence in two years has been produced to prove that any bank account was ever opened for and on behalf of the investor outside of the I-Trust account.

23

64.    Promised under the TEK contract were beneficial distributions from the trading, or buying and selling, of bank instruments secured by the collateral on deposit. The language of the TEK Contract specifically says at the beginning of paragraph 1.8 under subtitle "Procedures" that "as benefits are received they are divided and distributed equally, by the Trust Officer, on a 50/50 basis to the Asset Manager and the Investors respective accounts as per instructions provided in the Trust Agreement."

65.    In the very next line in the paragraph referenced in 64 of the TEK Contract there is what appears to be an illusory promise and the main point of division amongst the parties. The exact words are: "TEK Corp guarantees a minimum return to the Investor of 100% per month for one year with the option to renew this agreement as stated previously." What is so significant about this sentence is that it is the inducement, the snare, to capture additional investors. The guarantee of 100% per month although appearing to be "too good to be true" is sold on a seductive level by telling investors that they are making a great contribution to the betterment of mankind and fulfilling a spiritual mission by helping others who will benefit as a direct result of their investment. This is "sold" on a level which takes direct advantage of the LDS penchant for bettering the world for the return of Jesus Christ and the improving of the condition of those less fortunate. All this and making a legitimate profit at the same time was irresistible.

66.    Robbins deliberated targeted LDS members because of their "trusting" nature and willingness to give everyone a chance to do something good in the world, to make a difference. Robbins absolutely convinced the investors that charitable moneys would be generated in large sums that would then be funneled through the TEK Foundation to establish a series of schools and other worthy projects. To further this ruse

he conned others to join his growing flock carefully picking those with credentials that impressed his LDS audience, but may have also been too trusting in Robbins sales pitch.

67.    To further the appearance that his program was legitimate the contract provided for what he termed a "distribution of benefits" (paragraph 1.9) that was to take place "in 30 days or less from the time the Trust Account is opened and the funds are received and posted to the account". In select situations funds were paid back to investors with the specific instruction that such funds were not "a return of investment funds" but were in fact "a payment of profits". Those who received these funds actually paid taxes on them as though they were in fact revenue. In a typical Ponzi style none of the investors ever received more than they actually invested. The returned funds did however have their desire result. A new round of investments followed much larger than the first.

68.    The payment of funds back did confirm however that accounts had been opened according to the terms of the contracts. However the only information or reports shared with the plaintiffs were in house generated balance sheets that did not reveal the true bank accounts being used or just where the funds were actually being invested, if at all.

69.    A campaign of misinformation began with a series of now hundreds of e-mails attempting to delay and put off the investors well beyond the contract period. Robbins, working through Lister and Cox, continuously came up with deceptive excuses for delays. Finally after it seemed investors would not wait any longer a new ploy was proposed which included the entering into a new contract as a supplement to the original.

The reason for the new contract was explained was due to a requirement of the investing bank.

70.    Investors by this time had sought the advise of legal counsel and had begun cooperating with federal and state authorities who were responding to complaints about the suspicious nature of the transaction and how it appeared to be like so many others warned of by the Treasury Department and other policing agencies. Under the advice of counsel plaintiffs turned over all information available to authorities in an attempt to verify the authenticity of the transaction or to expose it as a fraud. With the help and cooperation of state and federal authorities it was determined that the so-called transactions were in fact a fraud.

71.    To facilitate the investigation and to further prove the intent of the defendants the plaintiffs, while under the scrutiny of government observation, accepted the new agreements and executed the contracts that had been prepared by the defendants to extend the period for payment. Once again the defendants failed to honor the new extension contracts and showed their intent.

72. There had been some doubt, even at such a late date, in the minds of some of the plaintiffs whether the defendant had been themselves just the victims of scam artists who they had relied upon to make the original promises. However that time has passed and even if there had been deception at the root of the defendants inability to perform under the contract they did not take the many opportunities to disclose it and took positive steps to further the deception and unlawfully retain the money of the plaintiffs.

73. The facts now appear that the defendants did in fact use the cash of the

plaintiffs to pay their own salaries, buy properties, expend it to support Robbins in his lifestyle in Europe, and to open certain businesses in the Fillmore and surrounding area. There is also evidence that the funds of the plaintiffs was used to purchase stock in a company known as "Pro-TEK" and the plaintiffs seek now the return of their stolen investment and damages.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

74. Plaintiffs repeat and reallege Paragraphs 1 through 73 above.

75. Defendants, and each of them, and more particularly Robbins, Lister, and Cox, by engaging in the conduct described in paragraphs 1 through 73 above, directly and indirectly in the offering to entering into a contract which made a return of 100% per month for a year and a month and then failing to pay the return without just cause did so with the intent of depriving the plaintiffs of their money without the real ability or intent to fulfill on the contract, without any means of fulfilling the contract did breach that contract to the detriment of each of the plaintiffs to amounts to be otherwise stated herein or determined at trial, and thereby causing other damages to the plaintiffs who were unlawfully deprived of the use and access to their rightful funds. This was done through the use of means or instruments of transportation or communication in interstate commerce or of the mails, with scienter, employed devices, schemes, or artifices to defraud.

76. Plaintiffs seek damages in excess of two million five hundred thousand dollars ($2,500,000.00) to be determined at time of trial.

77. Plaintiffs seek an additional amount of ten million dollars ($10,000,000) in punitive damages.

## SECOND CAUSE OF ACTION

## EMPLOYMENT OF DEVICE, SCHEME, OR ARTIFICE TO DEFRAUD

78. Plaintiffs repeat and reallege Paragraphs 1 through 73 above.

79. Defendants, and each of them, by engaging in the conduct described above, directly and indirectly in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or of the mails, with scienter, employed devices, schemes, or artifices to defraud. The defendants Robbins, Lister, Cox and others did deceive the plaintiffs about the nature and reality of the investment program they presented and sold, even taking extra steps to make more believable a fiction that existed that gave the enticing appearance of beneficial aid to children I need. What makes this particularly offensive is the deliberate use of the known sympathies of the religious convictions of the plaintiffs to help the needy and the use of such confidences to take advantage of the plaintiffs.

80. Plaintiffs seek damages in the amount of five million dollars ($5,000,000.00)

for compensation collectively for the effects of the above violations and their impact on the families and business of the plaintiffs.

### THIRD CAUSE OF ACTION

### THEFT BY DECEPTION

81. Plaintiffs repeat and reallege Paragraphs 1 through 73 above.

82. Plaintiffs allege that Defendants through the use of a confidence scam induced plaintiffs to enter into an unlawful contract for the sole purpose of stealing their money under false pretenses and doing so through a created artifice that was of no substance and was merely a ruse to deprive them of their lawful money. That the plaintiffs did directly and indirectly, by the use of contracts or instruments through the use of transportation or communication in interstate and international commerce, with intent, did employ devices, schemes, or artifices to commit this theft. That defendants Robbins, Lister, Cox and others did work in unison, in a conspiracy to create the illusion that there was in fact a legitimate business and that the promises and representations of TEK were being fulfilled when in fact they were not.

83. In furtherance of this scheme the defendants established a series of entities to hide the money and to make uses of it that were not contemplated under the original agreement, taking risks not approved, and then refusing to return the funds upon demand.

84. Plaintiffs seek return of their money and the assistance of this honorable court by order if necessary to secure their assets in whatever form to which they have been transferred.

## CONCLUSION

Plaintiffs here respectfully pray for the following relief in the interest of justice:

1. Plaintiffs seek for breach of contract damages in excess of two million five hundred thousand dollars ($2,500,000.00) for the return of cash invested to be determined at time of trial.

2. Plaintiffs seek an additional amount of ten million dollars ($10,000,000) in punitive damages for breach of contract.

3. Plaintiffs seek damages in the amount of five million dollars ($5,000,000.00) for compensation collectively for the effects of the deceptive practices which increased unnecessarily the effects of the deception in damage to the families and businesses of the plaintiffs.

4. Plaintiffs seek return of their money and the assistance of this honorable court by order if necessary to secure their assets in whatever form to which they have been transferred.

5. Plaintiffs seek any and all such other damages to which this court determines

as appropriate to the circumstances.

6.  Plaintiffs further seek just and reasonable compensation for the cost in

attorney's fees and court costs and expenses in bringing this action.

7.  Plaintiff's pray that, due to the complex nature of this case and the propensity

of the defendants to hide assets and use deceptive practices in bad faith, they be given

leave of this court to further amend these damages and this complaint upon the discover

of other assets and other defendants.

Respectfully submitted this ___15___ day of November, 2004.


Paul J. Young
Counsel for the Plaintiffs